PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

JOHN E. HARGROVE,

*Defendant-Appellant.*

No. 08-5223

Appeal from the United States District Court
for the Northern District of West Virginia, at Martinsburg.
John Preston Bailey, Chief District Judge.
(3:07-cr-00058-JPB-DJJ-1)

Argued: September 21, 2010

Decided: November 19, 2010

Before TRAXLER, Chief Judge, and MOTZ and AGEE,
Circuit Judges.

Affirmed by published opinion. Judge Agee wrote the opinion, in which Chief Judge Traxler and Judge Motz concurred.

## COUNSEL

**ARGUED**: Tracy Weese, Shepherdstown, West Virginia, for Appellant. David J. Perri, OFFICE OF THE UNITED STATES ATTORNEY, Wheeling, West Virginia, for Appellee. **ON BRIEF:** Sharon L. Potter, United States Attorney,

Robert H. McWilliams, Jr., Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Wheeling, West Virginia, for Appellee.

## OPINION

AGEE, Circuit Judge:

John E. Hargrove appeals his convictions for attempted transfer of obscenity to a minor, in violation of 18 U.S.C. § 1470 ("Count I"), transfer of child pornography, in violation of 18 U.S.C. § 2252A(a)(1) ("Count II"), and attempted enticement of a minor, in violation of 18 U.S.C. § 2422(b) ("Count III"). Specifically, Hargrove asserts the district court should have suppressed statements he made to law enforcement officers because at the time he made them he was subject to a custodial interrogation and had not been informed of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). Hargrove also contends his sentence is substantively unreasonable because the district court erred by considering that Hargrove exercised his right to a jury trial as a basis for the sentence imposed. For the reasons set forth below, we affirm the judgment of the district court.

I.

For a period of several months, Hargrove communicated in internet chat rooms with two undercover law enforcement officers posing as underage females. During the same period, Hargrove also communicated with two actual underage females.[1] The online conversations with the two undercover officers and one of the actual minors ("S.M.") (collectively "the three minors") contained graphic sexual talk as Hargrove described in explicit detail how the three minors should pre-

---

[1] Hargrove's communication with one of the actual minors was not as explicit as with the other actual and putative minors.

pare for their chats, how to behave throughout daily life, and how to "be ready for" their eventual meeting when the three minors would serve as Hargrove's sexual slaves. Hargrove asked the three minors to send him photos of each of them engaged in sexual acts and also sent them images depicting child pornography and various sexual activities involving bondage. As the discussions progressed, Hargrove made extensive plans with the three minors to coordinate how they would come live with him as "slave sisters," including coordinating financial and travel arrangements and asking them to each obtain the signature of her mother so that he could create false emancipation papers.

As the communications reached the point where Hargrove was attempting to arrange meeting the three minors in person, the Federal Bureau of Investigation ("FBI") obtained and executed a search warrant on Hargrove's residence in Bristol, Connecticut. Michael Chance, a computer crimes task force officer, was the lead investigating officer present during the January 5, 2007, execution of the search warrant. FBI Special Agent Cathy Shumaker was the senior officer assisting with the case, and was also present during the execution of the search warrant. In addition to overseeing the search, Agent Chance interviewed Hargrove, during which time Hargrove made a number of incriminating statements.

In July 2007, a federal grand jury in the Northern District of West Virginia indicted Hargrove on Counts I, II, and III.[2] Hargrove initially negotiated a "binding" plea agreement with the Government. The agreement was structured so that Hargrove would plead guilty to Count III, the Government would dismiss the remaining charges, and the district court would impose the negotiated maximum sentence of 240 months' imprisonment. In the event the district court rejected the plea

---

[2]One of the undercover officers' online profiles indicated that she resided in Romney, West Virginia, which is the basis for the proceedings in the Northern District of West Virginia.

agreement, Hargrove was free to withdraw his guilty plea. Based on this plea agreement, Hargrove entered a guilty plea to Count III. The magistrate judge conducted a hearing pursuant to Rule 11 of the Federal Rules of Criminal Procedure and determined that Hargrove's plea was voluntarily and competently made.

After the preparation of a pre-sentence report ("PSR"), but before the district court accepted the plea and sentenced him, Hargrove moved to withdraw the guilty plea.[3] At the hearing on that motion, the district court granted Hargrove's request, explaining:

> Normally under these circumstances I would not permit the defendant to withdraw the plea, but in this case the plea agreement that was entered into and tendered to the Court is a binding plea agreement with a binding sentence that is well below the Guideline sentence in this case. At the time I reviewed the [PSR], and assuming that those things in it are true, which, of course, if we have a trial will be up to the jury to determine, but if in fact those things are true, I had a real concern that the plea agreement as set forth did not provide for a—for a sufficient level of punishment.
>
> Mr. Hargrove has now asked to withdraw his plea, which I would have to let him do if I refused to follow the plea agreement anyway since it is a binding plea. So, I will permit Mr. Hargrove to withdraw his plea of guilty.

(J.A. 77-78.)

---

[3]At various times during the proceedings below, Hargrove was represented by counsel or, upon Hargrove's request, proceeded pro se. Hargrove's representation at any given point in the proceedings is not relevant to the issues on appeal.

Prior to trial, Hargrove moved to suppress the statements he made during the January 5, 2007 search of his home, arguing that because the statements were obtained during a custodial interrogation and yet without the benefit of *Miranda* warnings, they should be excluded. A magistrate judge conducted a suppression motion hearing, at which Special Agents Chance and Shumaker, as well as Hargrove, testified.

Agent Chance testified that he and a team of between ten and fifteen law enforcement officers executed the search warrant on Hargrove's Connecticut residence shortly after 6:00 a.m. Approximately five of the officers were part of the entry team, and the rest — including Agent Shumaker — were located around the perimeter of the residence. Agent Chance could not recall who answered the door, but upon entering, the officers "cleared the residence making sure there was [sic] no officer safety issues, no weapons, making sure [they] identified all people on-scene and that . . . [they] were safe."[4] (Supp. J.A. 20.) Agent Chance testified that he could not recall whether his service firearm was drawn or pointed at Hargrove upon entering the house, but he averred that some officers did have their firearms drawn during the initial entry and security sweep, consistent with standard protocol.[5]

Agent Chance testified that he told Hargrove that he was not under arrest and was free to leave the house at any time. He then asked if Hargrove would speak with them and Hargrove agreed.[6] Agent Chance and Hargrove then sat around

---

[4]In addition to Hargrove, Hargrove's daughter, who Agent Chance testified was "probably in her 20's," and the daughter's boyfriend were inside the home. (Supp. J.A. 20.)

[5]Agent Shumaker testified her gun was not drawn, although she did have her service firearm with her. She did not know whether anyone on the entry team had their weapons drawn.

[6]Agent Shumaker testified that if Hargrove had expressed a desire to leave his house, he would have been free to do so, and the agents "would have just asked how he wanted the premises secured. We were going to stay and complete the search but he was free to" leave. (Supp. J.A. 50.)

Hargrove's kitchen table during the subsequent interview, with Hargrove dressed in his pajamas. Agent Shumaker was also present, standing in the doorway of the kitchen, but she did not question Hargrove. Neither Agent had an arrest warrant for Hargrove or had any intention of arresting him. According to both Agents (and Hargrove's own testimony), Hargrove was not in handcuffs, he was permitted to smoke cigarettes, and at no time did Hargrove ask for the interview to end or protest about any of the questions. Instead, the Agents testified Hargrove was "polite and cooperative," answering questions "at length," and indicating he was willing to talk further when the interview was finished. (Supp. J.A. 24-25.) Agent Shumaker also testified that "it was [a] relaxed" setting and Hargrove was cooperative throughout. (Supp. J.A. 49.) According to the Agents, Hargrove was not instructed to remain seated or forbidden from leaving the room and that he was "freely moving around" at times during the interview. (Supp. J.A. 51.) At one point in particular, Agent Shumaker observed him getting up to "deal[ ] with the cat, going back and forth from the door or something." (Supp. J.A. 51.) During the interview, Hargrove expressed interest in working with the police "undercover to help identify people that were pursuing children." (Supp. J.A. 26.) Hargrove was not read *Miranda* rights before or during the interview.[7]

Hargrove's version of the search and subsequent interview differed in some respects from the Agents'. He testified that his daughter answered the door after the entire household was awakened by the officers banging on his front door. When he entered the living room, "an officer [was] standing there with what looked like an M-16, and there was a laser scope on it and it was pointed straight at me. I immediately threw my

---

[7]According to the Agents' testimony at trial, the interview lasted approximately two hours. At the suppression hearing, Agent Chance testified that the interview lasted for a long time because Hargrove "had a lot to say," would answer questions "at length," and was willing to talk further when the interview was finished. (Supp. J.A. 25.)

hands up in the air and said, 'I'm not armed.'" (Supp. J.A. 75.) Hargrove testified he was directed to the kitchen, patted down, and told that Agent Chance had some questions to ask him. Hargrove claimed that his movement was restricted and he was not allowed to get cigarettes from the computer desk in his bedroom. He also testified he did not feel that he could leave the kitchen because Agent Shumaker "was actually standing in the doorway between the kitchen and the dining room" "blocking" the exit. (Supp. J.A. 76.) In addition, he claimed that at one point he asked to "get up and get [his minor] daughter and go out on the porch" to smoke, but he was not allowed to do so because his daughter was being interviewed by officers in another room. (Supp. J.A. 81.) Hargrove admitted that the officers' guns were not drawn while they were talking in the kitchen, he was not handcuffed, and they did not threaten him beyond feeling intimidated by having a "bunch of armed officers around." (Supp. J.A. 78.) He testified that the agents did not read him his *Miranda* rights, tell him he was free to leave, or any statements "to that effect." (Supp. J.A. 77.) Moreover, at the time of the interview Hargrove "felt [he] was going to be" arrested because Agent Chance informed him they had copies of "everything that [Hargrove] said on the chat log." (Supp. J.A. 76, 79.) Hargrove admitted that he answered Agent Chance's questions even though he "wasn't real thrilled about it," and that during the interview he "figured [he] was going to jail, [so] it didn't make any difference one way or another" whether he spoke to the Agents. (Supp. J.A. 80.)

The magistrate judge recommended denying the motion to suppress. He concluded the interview "was consensual and was not custodial in nature," and he credited Agent Chance and Shumaker's testimony that they informed Hargrove "he was not under arrest and . . . was free to go at any time during the interview," and that Hargrove appeared "extremely relaxed and cooperative during the interview and seemed to enjoy talking with the agents." (J.A. 157.) The magistrate further noted that the interview took place in Hargrove's kitchen

"in a comfortable atmosphere," and that no evidence of coercion or improper inducement existed. (J.A. 157.)

Hargrove objected to the magistrate judge's recommendation, contending that the agents were not there simply to conduct the search because they had surrounded the house before entering, which would not have been necessary if they did not want to keep everyone inside the residence, and that during the interview Agent Shumaker "block[ed] [his] entry to his living room" and Agent Chance "positioned himself between [Hargrove] and the back door."

The district court adopted the magistrate judge's recommendation. The court observed that Hargrove's argument "that he did not feel free to leave is not dispositive" because "'[c]ustody determinations do not depend on the subjective views of either the interrogating law enforcement officers or the person being questioned, but depend instead [on] the objective circumstances of the interrogation.'" Concluding, the district court found that

> [g]iven the testimony of Agents Chance and Shumaker, and defendant's own testimony, that defendant was not handcuffed at the time his statements were made; that the agents did not draw their weapons in the kitchen; that defendant was told he was not under arrest and that he was free to leave; and that the conversation that took place between the defendant and the agents was amicable and non-threatening in tone, the [c]ourt finds that defendant was not in custody at the time of his interview on January 5, 2007 and, therefore, not subject to the protection of *Miranda* warnings. Defendant's objection is accordingly overruled.

The case proceeded to trial by jury, and the Government introduced into evidence the statements Hargrove made to Agent Chance during the January 5, 2007 interview. In addi-

tion, the two law enforcement officers posing as minor females and S.M., inter alia, testified against Hargrove. At the end of the three-day trial, the jury convicted Hargrove on all three counts.

After hearing the parties' arguments as to the Sentencing Guidelines calculation, the district court determined the appropriate combined adjusted offense level to be 46, although the Guidelines cap the offense level at 43.[8] When combined with a criminal history category of II, the Guidelines called for 120 months' imprisonment on Count I, 240 months' for Count II, and life imprisonment on Count III. After hearing further arguments as to an appropriate sentence, the district court sentenced Hargrove to 120 months' imprisonment on Count I, 240 months' imprisonment on Count II, and life imprisonment on Count III, with all sentences to run concurrently. The court stated that it had considered the § 3553(a) factors and found no reason "to deviate downward from the Guideline[s] sentence in this case." (J.A. 1048-49.) The court also noted:

> I permitted—after the plea had been entered, I permitted Mr. Hargrove to withdraw that plea. And I did it much more readily than I have ever allowed anybody to withdraw a plea. And the main reason I did that was because I did not agree that 240 months was an appropriate sentence, given what I had seen in the presentence investigation report.
>
> At that point, the defendant had already, in my opinion, damaged the life of a young girl. By then

---

[8]The base offense level was 32, but the district court determined the following Guidelines enhancements were applicable: age of the victim (2-level increase), an offense involving the commission of a sexual act (2-level increase), distributing pornographic images of a minor engaged in a sexual act (2-level increase), pornographic images depicting sadistic or masochistic conduct (4-level increase), and use of a computer service (2-level increase).

requiring this case to go to trial and requiring her to come forward and sit in the courtroom in front of 13 jurors, and all the other people in the courtroom, I think more damage was probably done to the young lady.

(J.A. 1049.) The court then discussed Hargrove's diverse and lengthy criminal history, and concluded that consideration of that history did not warrant imposing a lesser sentence. Next, it recounted the graphic nature of Hargrove's offenses and related conduct. In light of that conduct, the court observed that even without the 4-level enhancement for sadistic and masochistic conduct that it had applied to Hargrove's Guidelines calculation, the Guidelines range would still have included life imprisonment and that the court would have "imposed life." (J.A. 1050.) Moreover, it concluded, "frankly, if [the Guidelines range] had been lower due to some other enhancement factor not being included, I feel comfortable that I would have varied upward and imposed the life sentence. It is the opinion of this [c]ourt that Mr. Hargrove should never see the light of day." (J.A. 1050.) Hargrove did not object to the district court's explanation of the sentence imposed.

Hargrove noted a timely appeal, and we have jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

## II.

### A.   Motion to Suppress

Hargrove first maintains that the district court committed reversible error in denying his motion to suppress the statements made to Agent Chance because he was under custodial interrogation at that time and had not been read his *Miranda* rights. He asserts that the totality of the circumstances surrounding his making the statements — including the early hour, the entry into his home by numerous officers with their weapons drawn and an M-16 aimed at him, being denied per-

mission to retrieve cigarettes or speak with his daughter, and Agent Shumaker blocking the exit to the kitchen — showed that the statements were involuntarily made. Although Hargrove agrees there was evidence to support the district court's conclusion, he contends that under the "totality of the circumstances" standard there was more evidence from which to conclude that he reasonably believed it was a custodial interrogation, and the district court should have ruled his statements were inadmissible.[9]

The issue presented is thus straightforward — whether the January 2007 interview in Hargrove's kitchen constituted a "custodial interrogation." If it did, then Hargrove's statements, which the parties agree were made without the benefit of *Miranda* warnings — were inadmissible against him at trial. *See Miranda*, 384 U.S. at 444 (adopting the prophylactic rule that evidence should be excluded where it is obtained during a custodial interrogation and without first advising the accused of his Fifth Amendment rights); *United States v. Parker*, 262 F.3d 415, 419 (4th Cir. 2001) ("Absent formal arrest, *Miranda* warnings only apply where there has been such a restriction on a person's freedom as to render him in custody." (internal quotation marks omitted)). If the interview was not a custodial interrogation, then the statements were admissible.

Hargrove properly preserved this issue for appeal by making the pre-trial motion to suppress and obtaining a definitive

---

[9]Hargrove also briefly contends that Agents Chance and Shumaker "went out of their way not to memorialize" the substance of the interview and points to the lack of any contemporaneous written proof of what transpired as a basis for discrediting their version of events. (See, e.g., Appellant's Br. 24-25.) However, this argument only tangentially relates to the issue before us on appeal, whether Hargrove was under custodial interrogation at the time of the interview. Furthermore, there is no support in the record for Hargrove's contention and it is based on his pure conjecture. Agents Chance and Shumaker testified that it would not have been standard procedure to make an audio or video recording of the interview. Accordingly, we do not address this argument further.

ruling as to the admissibility of the statements. *See* Federal Rule of Criminal Procedure 51(b) ("A party may preserve a claim of error by informing the court—when the court ruling or order is made or sought—of the action the party wishes the court to take, or the party's objection to the court's action and the grounds for that objection. . . . A ruling or order that admits or excludes evidence is governed by Federal Rule of Evidence 103."); *see also* Federal Rule of Evidence 103(a) ("Once the court makes a definitive ruling on the record admitting or excluding evidence, either at or before trial, a party need not renew an objection or offer of proof to preserve a claim of error for appeal."). Consequently, the Court reviews the district court's findings of fact for clear error, and its conclusions of law de novo. *United States v. Uzenski*, 434 F.3d 690, 704 (4th Cir. 2006) (citing *United States v. Parker*, 262 F.3d 415, 419 (4th Cir. 2001)). The Court views the evidence in the light most favorable to the Government, the prevailing party below. *Id.* (citing *United States v. Seidman*, 156 F.3d 542, 547 (4th Cir. 1998)).

The Supreme Court has described the test for whether an individual is "in custody" despite the lack of a formal arrest to be whether, under the totality of the circumstances, "a suspect's freedom of action is curtailed to a 'degree associated with formal arrest.'" *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam)). The operative question is whether, viewed objectively, "a reasonable man in the suspect's position would have understood his situation" to be one of custody. *Id.* at 442. This determination is made by examining "all of the circumstances surrounding the interrogation" and determining "how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her 'freedom of action.'" *Stansbury v. California*, 511 U.S. 318, 322, 325 (1994) (per curiam) (quoting *Berkemer*, 468 U.S. at 440). In conducting this inquiry it is important to remember that "[a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the

fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime." *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam). But only when there is a custodial interrogation is it necessary for the police to provide the suspect with *Miranda* warnings. *Id.* (holding law enforcement officials are not required to administer *Miranda* warnings to everyone they question).

Hargrove relies primarily on *United States v. Colonna*, 511 F.3d 431 (4th Cir. 2007), where this Court held that the totality of the circumstances indicated Colonna was "in custody" during police questioning. *Id.* at 436. There, the defendant was awakened when police kicked open his bedroom door and, at gun point, ordered him to dress and come downstairs. During that process, an agent injured the defendant by slamming him into a door jam. Colonna and the other individuals in the home were continuously guarded by agents. *Id.* at 433. Colonna's home was "inundated with approximately 24 officers" who controlled where Colonna and the other individuals sat and restricted their access to the home. *Id.* at 435. Colonna was asked to accompany an FBI agent to a vehicle located outside, where a "full-fledged interrogation took place." *Id.* The interrogation lasted "for almost three hours, albeit with breaks." *Id.* Although Colonna was not placed under arrest, he was informed that lying to a federal agent was a federal offense. Moreover, while agents informed Colonna that he was "not under arrest," they did not inform him that he was "free to leave." *Id.* The Court noted that "a law enforcement officer simply stating to a suspect that he is 'not under arrest'" is not sufficient to "end the inquiry into whether the suspect was 'in custody.'" *Id.* Based on the totality of the circumstances, the Court noted that Colonna "did not initiate police questioning and was never told he was free to leave or that he did not have to respond to questions." *Id.* at 436. Moreover, the "interrogation occurred in a police dominated environment where the agents did everything to make Colonna, or any reasonable man believe that he was not free to leave." *Id.*

Our decision in *United States v. Parker*, 262 F.3d 415 (4th Cir. 2001), exemplifies where the totality of the circumstances do not indicate the defendant was "in custody" for *Miranda* purposes. There, the district court found the officers informed Parker she was not under arrest, Parker "was not handcuffed or otherwise restrained, and the agents did not draw their weapons in her presence." *Id.* at 419. The interview occurred in Parker's home, and a relative twice entered the room where agents were interviewing Parker. Parker "was not forced to enter the room with the officers, and she was never told that she was not free to leave." *Id.* Under these circumstances, the Court concluded Parker was not "in custody" and the district court did not err in declining to suppress Parker's statements. *Id.*

In the case *sub judice*, our task, as always, is to assess the totality of the circumstances rather than focusing on any one component of the interview. Based on the totality of the circumstances, we conclude that Hargrove was not subject to "custodial interrogation" at the time of Agent Chance's interview.

The record does show that some of the officers were armed upon entry of Hargrove's home, directed the occupant's actions during the initial safety sweep of the residence, and conducted a safety pat down of Hargrove. The agents had authority to secure the premises and detain the occupants temporarily in order to secure the site for conducting a search pursuant to a valid search warrant. *See United States v. Photogrammetric Data Servs.*, 259 F.3d 229, 239 (4th Cir. 2001) (citing *Michigan v. Summers*, 452 U.S. 692, 702-03 (1981)), *overruled on other grounds by Crawford v. Washington*, 541 U.S. 36 (2004). Although securing premises and controlling occupants pursuant to a search could support a custody finding in the appropriate circumstances, *see, e.g.*, *United States v. Revels*, 510 F.3d 1269, 1274-77 (10th Cir. 2007); *United States v. Mittel-Carey*, 493 F.3d 36, 40 (1st Cir. 2007), there is no evidence in this case that a custodial level of control

extended beyond the initial entry by the search team. As such, the agents' actions did not place Hargrove "in custody" when Agent Chance interviewed him some time later, after the search was underway. *See id.* (rejecting defendant's argument that he was under custodial interrogation during an interview that took place during the execution of a search warrant and after armed officers "entered his apartment" to execute a search warrant and "frisked him" during the initial entry). While between ten and fifteen agents participated in the initial execution of the search warrant, only two agents were with Hargrove during the interview. Moreover, Hargrove testified that he was never placed in handcuffs and that although Agents Chance and Shumaker were armed, their firearms were not drawn during the interview and they did not threaten him. The mere presence of armed law enforcement officers during the interview is not sufficient to create a custodial situation.

Significantly, the district court found two important facts concerning what Agent Chance told Hargrove prior to the interview: both that Hargrove was not under arrest *and* that he was free to leave. We must accept those findings because they have ample support in the record and we have no basis upon which to conclude that they are clearly erroneous. *See United States v. Murphy*, 552 F.3d 405, 409-10 (4th Cir. 2009). The district court also found that the testimony of Hargrove, Agent Chance, and Agent Shumaker was consistent as to key facts underlying its ultimate determination that under the totality of the circumstances Hargrove was not "in custody" at the time of the interview. Those facts included: Hargrove was not handcuffed at the time of the interview, "the agents did not draw their weapons in the kitchen," and the conversation was "amicable and non-threatening in tone."

While *Colonna* held that informing a suspect that he was not under arrest was insufficient, standing alone, to sustain a ruling that questioning was non-custodial, the court affirmed that such a statement was a factor in assessing the totality of

the circumstances. 511 F.3d at 435; *see also Davis v. Alls-brooks*, 778 F.2d 168, 171-72 (4th Cir. 1985) ("Though informing a suspect that he is not under arrest is one factor frequently considered to show lack of custody, it is not a talismanic factor." (citations omitted)). Moreover, the second statement — that Hargrove was free to leave — was not present in *Colonna*, and affirmatively informed Hargrove that he did not have to participate in the interview or even remain in the house.[10] *See Colonna*, 511 F.3d at 436 (citing with approval *United States v. Ollie*, 442 F.3d 1135, 1138 (8th Cir. 2006), which "not[ed] that although advising someone that he or she is not under arrest mitigates an interview's custodial nature, 'an explicit assertion that the person may end the encounter is stronger medicine.'"). This affirmative statement of being free to leave goes beyond the merely implied permission to leave that the Court in *Parker* noted was important to its totality of the circumstances analysis. Agent Chance did not simply refrain from telling Hargrove that he was not free to leave, but he explicitly informed him he could leave. *Cf.* 262 F.3d at 419; *see also Uzenski*, 434 F.3d at 705 (finding no custodial interrogation where the interviewee was permitted to use the bathroom, the door to the room where the interview was conducted was left partially open at times, and the agents told him he was free to leave at any time). Such a statement, that the interviewee is free to leave, is not "talismanic" or sufficient in and of itself to show a lack of custody. However, it is highly probative of whether, in the totality of the circumstances, a reasonable person would have reason to believe he was "in custody."

The magistrate judge and district court also found that the

---

[10]Additional factors distinguish this case from *Colonna*: for example, fewer officers were involved, the officers met Hargrove at the front door rather than entering the home and startling him in his bedroom, there is no evidence that Hargrove was constantly guarded, and the interview occurred in Hargrove's kitchen rather than in a law enforcement vehicle outside the residence.

interview conducted in Hargrove's kitchen was in a "comfortable atmosphere" and was "amicable" and "non-threatening." This finding is not clearly erroneous either. And although the setting of the interview is not singularly dispositive, an interview at a suspect's residence tends to be more neutral than one that occurs at a law enforcement facility. A more relaxed environment usually indicates less formal police control over the location or the defendant, and thus suggests a setting that is not of the degree typically associated with a formal arrest. *Oregon v. Elstad*, 470 U.S. 298, 315 (1985) (environment not coercive where interview took place in living room of defendant's home, with his mother in the kitchen); *United States v. Braxton*, 112 F.3d 777, 785 (4th Cir. 1997) (statement not involuntary where defendant "was interviewed by law enforcement officers around the kitchen table in his mother's home"); *see also United States v. Ritchie*, 35 F.3d 1477, 1485 (10th Cir. 1994) ("Courts are much less likely to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings" (alterations, quotation, and citation omitted)); *United States v. Sutera*, 933 F.2d 641, 647 (8th Cir. 1991) ("It is also relevant that [the defendant] was 'on his own turf.' . . . While a person may be deemed to be in custody even in his own home, it is not the type of coercive setting normally associated with custodial interrogation.").

   Similarly, there is evidence that Hargrove was permitted to move about his house so long as doing so did not interfere with the ongoing search. Agent Shumaker testified that Hargrove was permitted to move around the house, and specifically left the kitchen to attend to his cat. Hargrove relies on two occasions where he contends he was prevented from doing as he wished — he was not allowed in his bedroom to retrieve cigarettes and he was prevented from talking to his daughter and smoking a cigarette with her on his front porch. However, the record also indicates that these requests would have interfered with or compromised the Agents' search of the home. Hargrove's cigarettes were located "by [his] com-

puter desk" in his bedroom, where officers were conducting their search and seizing his computer pursuant to the search warrant. Although Hargrove was not allowed to retrieve the cigarettes personally, they were brought to him so that he could smoke. Similarly, at the time Hargrove wanted to speak with his daughter on the porch and smoke together, other officers were interviewing her. Importantly, Hargrove's testimony was not just that he wanted to smoke outside and was prohibited from doing so, but that he specifically wanted to go out there in order to talk to his daughter. Thus, in both circumstances, the limitation on Hargrove's freedom of movement was minor. Moreover, because evidence in the record showed that Hargrove was permitted to move about his house when it did not interfere with the ongoing search, it cannot be said that Hargrove's conduct was curtailed to a "degree associated with formal arrest." *Cf. Berkemer*, 468 U.S. at 440 (quotation marks and citation omitted).

Similarly, although Hargrove described Agent Shumaker as "blocking" his exit from the kitchen, no evidence suggests that she was doing anything other than standing in the doorway overseeing both the interview and the ongoing search. Indeed, prior to being denominated as "blocking" by his attorney, Hargrove testified only that Shumaker was "standing in the doorway between the kitchen and the dining room, which is where she stood until the incident with the cat . . . ." (Supp. J.A. 76.) There is no evidence in the record that Agent Shumaker ever prevented Hargrove from exiting, or that she threatened or coerced Hargrove to remain in the kitchen. As such, her mere presence in the doorway of the kitchen was not sufficient to demonstrate that the agents restrained Hargrove's freedom of movement in a manner consistent with being in custody.

We further note that "[c]ustody determinations do not depend on the subjective views of either the interrogating law enforcement officers or of the person being questioned, but depend instead [on] the objective circumstances of the interro-

gation." *Parker*, 262 F.3d at 419. Accordingly, Agent Chance's and Agent Shumaker's intent not to arrest Hargrove at that time, and Hargrove's belief that he was going to be arrested are "of little weight" to our inquiry. *See id.*; *see also Stansbury*, 511 U.S. at 323. "The relevant inquiry is how a reasonable man would have understood the suspect's position at the time." *Parker*, 262 F.3d at 419. Indeed, Hargrove's after-the-fact assertions that he felt like he was going to be arrested and had to cooperate are entitled to limited consideration given the rest of the record and considering the totality of the circumstances at the time of the interview. *See Braxton*, 112 F.3d at 781 ("Subsequent testimony by an accused about his prior subjective mental impressions and reactions must be carefully scrutinized, as such testimony is always influenced by his self-interest." (internal quotation marks and alterations omitted)).

Here, the totality of the circumstances supports the finding that a reasonable man in Hargrove's position would have understood that he was not "in custody" from Agent Chance's statements that Hargrove was not under arrest and was free to leave, as well as the surrounding circumstances of the interview. This conclusion is further bolstered by the evidence in the record as to Hargrove's own conduct at the time — cooperative, loquacious, and expressing interest in working undercover to help the Task Force — as well as his testimony at the suppression hearing that he did not refuse to speak with the officers because "at that point I figured I was going to jail, [and talking to them] didn't make any difference one way or another." (Supp. J.A. 80.) Furthermore, Hargrove never asked for the interview to end, never objected to any of the questions, and remained "polite" and "cooperative" throughout the period. (Supp. J.A. 50-51.) For these reasons, we conclude the district court did not err in denying Hargrove's motion to suppress because the January 2007 interview did not constitute a "custodial interrogation" that invoked his right to be read *Miranda* warnings.

### B.   Hargrove's Sentence

Hargrove next asserts that his sentence should be vacated and the case remanded for resentencing because the district court erred by considering Hargrove's decision to go to trial as part of the explanation for the sentence it imposed. Relying on *Bordenkircher v. Hayes*, 434 U.S. 357 (1978), Hargrove contends that the district court's statements violated his due process rights by penalizing him for exercising a constitutional right.[11]

Since the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), the federal Sentencing Guidelines have been "effectively advisory," *id.* at 245, and appellate review of district court sentences has been for "reasonableness." In *Gall v. United States*, 552 U.S. 38 (2007), the Supreme Court explained that appellate review for "reasonableness" involves both procedural and substantive components. The Court first reviews for procedural reasonableness,

> ensur[ing] that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the [18 U.S.C. §] 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence—including

---

[11]In *Bordenkircher*, the Supreme Court held that "punish[ing] a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort." 434 U.S. at 363; *see also Burns v. Gammon*, 260 F.3d 892, 896 (8th Cir. 2001) (holding the "prosecution cannot use the defendant's exercise of specific fundamental constitutional guarantees against him at trial" by encouraging the jury to consider that the defendant "by exercising his constitutional right to a jury trial and to confront witnesses, forced the victim to attend trial, take the stand and relive the attack.").

an explanation for any deviation from the Guidelines range.

*Id.* at 51. Once the reviewing court determines that the sentence is procedurally reasonable, it proceeds to the second component of the analysis, the substantive reasonableness of the sentence. *Id.*

> When conducting this review, the court will, of course, take into account the totality of the circumstances, including the extent of any variance from the Guidelines range. If the sentence is within the Guidelines range, the appellate court may, but is not required to, apply a presumption of reasonableness. . . . The fact that the appellate court might reasonably have concluded that a different sentence was appropriate is insufficient to justify reversal of the district court.

*Id.*

Hargrove does not raise any issues challenging the procedural reasonableness of his sentence. Accordingly, we proceed to the substantive reasonableness of his sentence.

Ordinarily, we review the substantive reasonableness of a sentence for abuse of discretion. *Id.* However, the record shows that Hargrove did not object to the district court's explanation of the sentence imposed. For this reason, the Government asserts that we should review under plain error and relies on this Court's decision in *United States v. Lynn*, 592 F.3d 572 (4th Cir 2010), to support its argument. *Lynn*'s holding was limited to the appropriateness of plain error review when a party raised an objection to the *procedural* reasonableness of a sentence for the first time on appeal. *Id.* at 575. *Lynn* thus does not address the precise issue raised in this case, whether plain error review is appropriate when a spe-

cific challenge to the *substantive* reasonableness of a sentence is lodged for the first time on appeal.

At oral argument, Hargrove conceded that his failure to object to the district court's explanation of his sentence meant that we should review for plain error. However, because we have not previously addressed the appropriateness of plain error review in this context, we decline to rely on Hargrove's concession, and instead address the issue directly.

Several circuit courts of appeal have held that appellate courts review the substantive reasonableness of a sentence for abuse of discretion regardless of whether the parties noted an objection below. However, a close review of these decisions shows that the actual challenge on appeal was to the substantive reasonableness of the *length* of the sentence rather than another specific component of the substantive reasonableness of the sentence. The basis for the holding that a party need not specifically preserve an objection only to the length of the sentence appears to be the belief that it is unnecessary to require a defendant to "object" and in essence immediately request "reconsideration" of a court's sentencing decision after having just presented argument as to an appropriate length of the sentence. *See, e.g.*, *United States v. Wiley*, 509 F.3d 474, 477 (8th Cir. 2007) ("such a[n] [after-the-fact objection requirement] is not warranted, at least where a party asserts only that *the length* of the sentence is unreasonable with regard to § 3553(a) . . . ." (emphasis in original)); *see also United States v. Autery*, 555 F.3d 864, 870-71 (9th Cir. 2009); *United States v. Bras*, 483 F.3d 103, 113 (D.C. Cir. 2007); *United States v. Castro-Juarez*, 425 F.3d 430, 433-34 (7th Cir. 2005).

In contrast, the Fifth, Sixth, and Tenth Circuits have held that the substantive reasonableness of a sentence is subject to plain error review when the defendant raises a specific claim of legal error on appeal and not merely a challenge to the length of the sentence, but failed to raise the same basis in the

district court. *See United States v. Stall*, 581 F.3d 276, 283 (6th Cir. 2009) (citing *United States v. Vonner*, 516 F.3d 382, 391-92 (6th Cir. 2008) (en banc)); *United States v. Whitelaw*, 580 F.3d 256, 259-60 (5th Cir. 2009) (citing *United States v. Peltier*, 505 F.3d 389, 390-92 (5th Cir. 2007)); *United States v. Lopez-Flores*, 444 F.3d 1218, 1220-21 (10th Cir. 2006).

In particular, the Fifth Circuit has noted that presenting "a specific legal error distinguishes [a] case from those that have held that the defendant need not specifically object that a sentence is 'unreasonable' to preserve a reasonableness objection on appeal." *United States v. Hernandez-Martin*, 485 F.3d 270, 272 n.1 (5th Cir. 2007). Thus, where a defendant raised the "specific legal error" that the sentencing judge "considered an inappropriate factor" in deciding what sentence to impose, the court reviewed only for plain error because the defendant failed to raise the objection below. *Id.* at 272. Similarly, the Tenth Circuit has noted the difference between challenging the reasonableness of the length of the sentence generally and challenging the method of getting there, and concluded that plain error review is appropriate in the latter circumstance, where "the usual reasons for requiring a contemporaneous objection apply." *Lopez-Flores*, 444 F.3d at 1221.

Here, rather than simply challenging the substantive reasonableness of his sentence due to its length or non-specific considerations, Hargrove raises a specific allegation of error — that the district court considered the improper factor of exercising his right to trial — during the sentencing hearing. This claim of error was not addressed at all in Hargrove's earlier arguments in favor of a below-Guidelines sentence. It was an alleged error that arose during the court's statements explaining the basis for the sentence it imposed. Hargrove failed to object to it at the time, thus denying the district court the opportunity to consider Hargrove's argument and correct the purported error. Hargrove raises this specific issue for the first time on appeal. Under these circumstances, we conclude that it is appropriate to apply the general principle established

in Federal Rule of Criminal Procedure 52(b), that in the absence of proper preservation, plain-error review applies. *See* Fed. R. Crim. P. 52(b) ("A plain error that affects substantial rights may be considered even though it was not brought to the [district] court's attention."). Accordingly, we review Hargrove's argument for plain error.

To establish plain error, Hargrove must show (1) that the trial court erred, (2) that the error is clear and obvious, and (3) that the error affected his substantial rights. *See United States v. Olano*, 507 U.S. 725, 732-34 (1993). Even when this burden is met, we have discretion whether to recognize the error, and should not do so unless the error "seriously affects the fairness, integrity or public reputation of judicial proceedings." *Id.* at 736 (quotation marks and alterations omitted).

Assuming, without deciding, that the first two requirements are met, we nonetheless conclude that Hargrove has not satisfied the third requirement of showing that the district court's reference to the victim testifying at trial affected Hargrove's substantial rights. An error affects a defendant's substantial rights if the error "affected the outcome of the district court proceedings." *Olano*, 507 U.S. at 734. "To satisfy this requirement in the sentencing context, the defendant must show that he would have received a lower sentence had the error not occurred."[12] *United States v. Knight*, 606 F.3d 171, 178 (4th Cir. 2010). Hargrove cannot clear this high hurdle. The district court's sentence was within both the statutory maximum and the properly-calculated Sentencing Guidelines range. The district court considered and addressed the § 3553(a) factors in explaining why it was imposing the sentence. In particular, it reiterated that Hargrove's criminal history and the seriousness of the offense justified the sentence it was imposing. And it emphasized that it would impose the identical sentence even

---

[12]At oral argument, Hargrove asserted that he need only show that he *could* have received a lower sentence in order to satisfy this requirement. Under our circuit's precedent, that argument is clearly wrong.

if Hargrove had a lower Guidelines range for any reason because it would have varied upward to life imprisonment due to the nature of Hargrove's conduct, which had led the court to conclude that "Hargrove should never see the light of day." (J.A. 1050.) Given this context and the district court's clear statements, Hargrove cannot show that he "would have received a lower sentence" had the district court not also mentioned that the victim incurred further harm by testifying at trial. Accordingly, Hargrove has not showed that the district court plainly erred and that resentencing is required.

## III.

For the aforementioned reasons, we hold that the district court did not err in denying Hargrove's motion to suppress statements he made to law enforcement agents in January 2007. In addition, we hold that the district court did not commit plain error during sentencing. Accordingly, we affirm the district court's judgment.

*AFFIRMED*