**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 18-4755

UNITED STATES OF AMERICA,

        Plaintiff – Appellee,

v.

JOHN MICHAEL FOWLER,

        Defendant – Appellant.

Appeal from the United States District Court for the District of Maryland, at Baltimore.
Richard D. Bennett, District Judge. (1:17-cr-00644-RDB-1)

Argued: December 10, 2019                      Decided: January 27, 2020

Before WILKINSON, THACKER, and RUSHING, Circuit Judges.

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Thacker and Judge Rushing joined.

**ARGUED:** Cullen Oakes Macbeth, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Baltimore, Maryland, for Appellant. Daniel Alan Loveland, Jr., OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee. **ON BRIEF:** James Wyda, Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Baltimore, Maryland, for Appellant. Robert K. Hur, United States Attorney, Paul E. Budlow, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.

WILKINSON, Circuit Judge:

Appellant John Michael Fowler argues that the district judge erred by mentioning the possible impact of good-time credits, and inaccurately calculating the potential impact of such credits, when sentencing him for the production and possession of child pornography. Fowler also argues that his final sentence was longer than needed to serve the proper purposes of sentencing. We disagree on all counts. The charges against Fowler stemmed from horrific conduct—his sexual abuse of two young girls. The district judge's mention of good-time credits was tied to 18 U.S.C. § 3553(a) factors, such as the need to protect the public, that he was *required* to consider during sentencing. By carefully weighing many relevant factors, the judge reached a substantively reasonable sentence of 40-years' imprisonment.

I.

A.

The facts of this case are not contested. John Michael Fowler sexually abused two young girls. He filmed and photographed some of this abuse, leading to the case at hand. One victim was his girlfriend's daughter ("Jane Doe 1" or "Jane"). Fowler began living with his girlfriend ("K.M.") and Jane in 2013. Between 2013 and 2014, Fowler sexually abused Jane, who was seven to eight years old at the time.

Fowler did not end his abuse of Jane until he moved out of the house in late 2014, despite almost being caught for abusive activities over a year earlier. In September 2013, a concerned citizen called the police on Fowler after seeing him behave suspiciously toward Jane on public transportation. Police responded and found that Fowler was carrying

2

a concealed weapon; they arrested him on a weapons charge. During an interview shortly afterwards, Jane told the police that Fowler was sexually abusing her at home. Four days later, she recanted when interviewed at the Baltimore City Child Abuse Center (the "BCAC"). According to K.M., Jane had seen K.M. placed in handcuffs the night of Fowler's arrest, and believed that K.M. would go to jail and that she would go to foster care if she told the truth about Fowler's abuse. Despite this "near miss," Fowler's sexual abuse of Jane continued.

Over a year later, in December 2014, Jane was diagnosed with chlamydia, a sexually transmitted disease, which both Fowler and K.M. had recently been treated for. Jane was interviewed at the BCAC a second time but, once again, did not disclose Fowler's continued abuse. Fowler stopped abusing Jane after he moved out at the end of 2014.

Several years later, in January 2017, ten-year-old Jane found a laptop at her home containing a video created by Fowler in 2014. The video showed Jane and her similarly aged cousin ("Jane Doe 2") singing and dancing while wearing only underwear. It briefly showed Fowler, also in underwear. Fowler's voice can occasionally be heard in the video: at one point, he directed the girls to take off their underwear. They did so and continued dancing. After finding the video, Jane was interviewed at the BCAC a third time.

During this third interview, Jane described the abuse she had suffered at Fowler's hands. Details included the following: Fowler offered Jane money to touch his penis; he put her hands on his penis; he put his penis on her chest; he attempted to put his penis in her vagina and in her bottom; and his abuse occurred only when her mother was out of the house.

3

The BCAC also interviewed Jane Doe 2, who disclosed that she had been abused by Fowler when she was around eight years old. Specifically, one night while sleeping over at Jane's house, she woke up to find Fowler taking a picture of her vagina with a cell phone; at the time, she was sleeping in a t-shirt without underwear, as was Jane. Jane Doe 2 also saw Fowler take pictures of Jane's vagina that night. Jane Doe 2 did not spend another night at Jane's house until after Fowler moved out.

In February 2017, officers from the FBI and the Baltimore City Police Department seized Fowler's laptop while executing a search warrant at his home. Fowler was interviewed the same day. He denied sexually abusing Jane, but investigators found at least four images showing such abuse on his laptop. Each image corresponds to a count in Fowler's indictment.

- <u>Count 1</u>: Image showing a nude Jane touching Fowler's erect penis.

- <u>Count 2</u>: Image showing Fowler and Jane, both nude, where Jane is holding an object that is touching Fowler's penis.

- <u>Count 3</u>: Image appearing to show Fowler raping Jane. A naked Fowler lies on top of a naked Jane with his torso positioned between her legs. This image was taken from the side, and Fowler appears to penetrate Jane.

- <u>Count 4</u>: Image appearing to show Fowler raping Jane. A naked Jane sits on top of a naked Fowler. Fowler's genitals are in contact with Jane's, and he appears to penetrate her.

Fowler was charged with five counts in his indictment. For the four counts described above, he was charged with the production of child pornography in violation of 18 U.S.C. § 2251(a). Count Five charged Fowler with the possession of child pornography in violation of 18 U.S.C. §§ 2252(a)(4)(B), (b)(2).

4

B.

Without reaching a plea agreement, Fowler pleaded guilty to all five counts. A production conviction carries a mandatory minimum sentence of 15-years' imprisonment and a maximum of 30-years' imprisonment, 18 U.S.C. § 2251(e), and a possession conviction carries no mandatory minimum sentence and a maximum of 20-years' imprisonment, 18 U.S.C. §§ 2252(a)(4)(B), (b)(2). Thus, Fowler faced a maximum potential sentence of 140-years' imprisonment.

Both Fowler and the government submitted sentencing memoranda. Fowler requested an all-concurrent sentence of 15-years' imprisonment, the mandatory minimum, followed by supervised release. His sentencing memorandum focused on his difficult childhood and his diagnoses of neurocognitive defects. The government requested a sentence of 50-years' imprisonment. Its sentencing memorandum focused on Fowler's abhorrent conduct and the impact on his child victims. It requested a sentence lower than the 140-year statutory maximum, after "tak[ing] into consideration the mitigating factors present, namely the defendant's disturbing childhood and his mental-health challenges." S.J.A. 212.

At Fowler's sentencing hearing on October 15, 2018, the district judge determined that the Sentencing Guidelines recommended life imprisonment for Fowler, based on his criminal history category of I and total offense level of 43. Both parties addressed the court. The government highlighted Fowler's egregious conduct, the abuse of trust integral to his crimes, and the "opportunistic" aspects of his behavior. J.A. 69. It also discussed the ongoing impact of Fowler's abuse on his victims, particularly Jane's struggles with

5

depression and anxiety. Consistent with its sentencing memorandum, the government requested a sentence of 50-years' imprisonment.

Once again, the defense requested a sentence of 15-years' imprisonment, asking the court to balance the harm caused by Fowler against "[his] acceptance of responsibility, his profound history of trauma, the circumstances that led to this offense, and his amenability to treatment and supervision." J.A. 49. During the hearing, the district judge asked the defense questions about Fowler's time in foster care as a child, his mental health issues, his employment history, and his eligibility for government benefits; the defense provided in-depth answers. In response to the government's proposed sentence, the defense argued that a sentence of 50-years' imprisonment would be "life-equivalent" and inappropriate as a matter of policy. J.A. 65.

The district judge recognized that Fowler was "a troubled individual" who has "had serious mental health issues" and "suffered extraordinarily in [] life." J.A. 71. However, the judge also noted that Fowler had "laid great pain upon the victims of this offense," J.A. 71, which "cannot be ignored, nor minimized, nor can the matter of public outrage not be minimized, nor can the matter of protection of the public be minimized," J.A. 73. The judge agreed with the defense that a life-equivalent sentence would be "very inappropriate," but also noted that a 15-year sentence would be "grossly inappropriate." J.A. 74-75.

After the district judge provided a detailed synopsis of the factors he was balancing in this case, J.A. 71-75, he described a portion of his thought process as follows:

> [I]t occurred to me that what is proportionate, what protects the public, what provides sufficiently severe punishment, but yet, at the same time, gives [Fowler] some light somewhere at the end of the tunnel, I think is around his

6

60th birthday, which, when crunching numbers, means that, with a sentence of 40 years' imprisonment, which is 480 months, that allowing that 20% knockoff perhaps for good-time credit, that it would mean that ultimately he would serve perhaps 32 years of a 40-year sentence -- who knows. That's up to the Bureau of Prisons. I can't control that -- from the age of 28. And the ultimate release date is more in the vicinity of his 60th birthday, not his 70th birthday.

J.A. 75. In the end, the judge sentenced Fowler to 40-years' imprisonment followed by 30-years' supervised release. J.A. 75-77. He ordered that Fowler be given credit for approximately ten months already served in federal custody and recommended to the Bureau of Prisons (the "BOP") that Fowler be given credit for an additional ten months served in state custody. J.A. 76.

Fowler appeals on three grounds. First, he argues that the district judge erred by mentioning the potential impact of good-time credits during sentencing, rendering the resulting sentence improper. Second, he argues that the judge committed procedural error by miscalculating the maximum impact of good-time credits. Finally, he argues that his sentence of 40-years' imprisonment is longer than necessary and thus substantively unreasonable.

II.

A.

"[S]entencing judges exercise a wide discretion in the types of evidence they may consider when imposing sentence . . . ." *Pepper v. United States*, 562 U.S. 476, 480 (2011) (internal quotation marks omitted). While this longstanding principle remains in force, Congress created a framework to guide judges during sentencing in 18 U.S.C. § 3553(a). *United States v. Raby*, 575 F.3d 376, 380 (4th Cir. 2009). Under § 3553(a)(2), a court "shall

7

impose a sentence sufficient, but not greater than necessary, to comply" with four purposes of sentencing—just punishment, adequate deterrence, protection of the public, and rehabilitation through training or treatment. 18 U.S.C. § 3553(a)(2); *see also Raby*, 575 F.3d at 380.

To reach its sentence, the court must weigh the seven factors listed in § 3553(a): "(1) offense and offender characteristics; (2) the need for a sentence to reflect the basic aims of sentencing . . . ; (3) the sentences legally available; (4) the Sentencing Guidelines; (5) Sentencing Commission policy statements; (6) the need to avoid unwarranted disparities; and (7) the need for restitution." *Rita v. United States*, 551 U.S. 338, 347-48 (2007); *see also* 18 U.S.C. § 3553(a)(1)-(7). Section 3553(a)'s broad language is consistent with the principle "that district courts enjoy significant discretion in sentencing, provided, of course, that they devise reasonable sentences." *United States v. Clark*, 434 F.3d 684, 689 (4th Cir. 2006) (Motz, J., concurring).

B.

We review all sentences for reasonableness. *Gall v. United States*, 552 U.S. 38, 46, 51 (2007). Our review proceeds in two steps. First, we "ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range." *Id.* at 51. The requirement of an adequate explanation is meant "to allow for meaningful appellate review" of a sentencing determination. *Id.* at 50.

8

If we find the sentence procedurally reasonable, we next review its substantive reasonableness, "tak[ing] into account the totality of the circumstances, including the extent of any variance from the Guidelines range." *Gall*, 552 U.S. at 51. A sentence is substantively unreasonable if it is longer than necessary to serve the purposes of sentencing. *United States v. Shortt*, 485 F.3d 243, 248-49 (4th Cir. 2007); *see also* 18 U.S.C. § 3553(a)(2). In addition, a sentence may be rendered substantively unreasonable if the district court relied on an improper consideration during sentencing. *United States v. Hargrove*, 625 F.3d 170, 184 (4th Cir. 2010).

C.

In the case at hand, we find ourselves in an odd situation. The defendant challenges the reasonableness of his sentence when the district judge imposed 40-years' imprisonment, a *downward* variation from the Guidelines recommendation of life. We begin with a few observations on the sentencing proceeding.

In many ways, the district judge ran a model proceeding. Would that all were conducted so well. First, the judge accurately calculated Fowler's Guidelines recommendation, removing an erroneous upward adjustment that appeared in the presentence report. *See United States v. Blue*, 877 F.3d 513, 517 (4th Cir. 2017). Second, he gave "the parties the opportunity to argue for whatever sentence they deem appropriate . . . ." *See id.* at 517-18 (internal quotation marks omitted). Third, the judge based Fowler's sentence on "an individualized assessment of the facts and arguments presented" and their relationship to § 3553(a) factors such as deterrence and protection of

the public. *See id.* (internal quotation marks omitted). Finally, the judge provided a thorough explanation for his chosen sentence of 40-years' imprisonment. *See id.* at 518.

Fowler attempts to pick apart the district judge's explanation, suggesting that his sentence is unreasonable because the judge mentioned the possibility of good-time credits a couple of times over the entirety of a well-done sentencing proceeding. Next, he quibbles with the judge's approximations on good-time credits. Finally, he argues that his 40-year sentence is longer than necessary to serve the purposes of sentencing.

III.

On appeal, Fowler argues for the first time that the district judge erred during sentencing by considering the possibility he might earn good-time credits. Specifically, Fowler contends that good-time credits are an improper sentencing consideration because they do not fall under any § 3553(a) factor and because their consideration undermines Congress's sentencing regime.

When a defendant argues for the first time on appeal that a district judge erred by considering an "improper factor" during sentencing, we review for plain error. *Hargrove*, 625 F.3d at 184. It is well settled that to establish plain error, a defendant must show "(1) that the trial court erred, (2) that the error is clear and obvious, and (3) that the error affected his substantial rights." *Id.* When these three conditions are met, it is within our discretion to correct the error. *United States v. Olano*, 507 U.S. 725, 732 (1993). However, we should exercise this discretion only if "the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *Id.* (internal quotation marks omitted); *see also Hargrove*, 625 F.3d at 184.

10

Fowler fails on the first prong of plain error review, as the district judge committed no error. During sentencing, the judge acknowledged what everyone knew: once in prison, Fowler might receive good-time credits entitling him to earlier release. *See* 18 U.S.C. § 3624(b). Every one of the judge's many considerations, including good-time credits, fell under § 3553(a) factors that he was required to consider in determining a just sentence. *See Pepper*, 562 U.S. at 480.

As the sentencing transcript shows, the district judge did not consider good-time credits as a stand-alone factor during sentencing, nor did he utilize them as any sort of vehicle for an enhanced sentence term. *See United States v. Roberts*, 919 F.3d 980, 992 (6th Cir. 2019) (holding that "[t]he mention of the availability of good-time credits does not render the sentence substantively unreasonable" when "[t]he court did not . . . consider good-time credit as a stand-alone factor in fashioning the length of the sentence"). Instead, he only considered the potential impact of good-time credits in relation to Fowler's age at release. Naturally, it would be impossible to determine a defendant's minimum age at release without consideration of good-time credits.

The district judge considered Fowler's age at release for two reasons, both of which are valid. First, age at release is correlated with recidivism rates, a necessary consideration for a judge charged with setting a sentence that protects the public and deters additional criminal acts. *See* 18 U.S.C. § 3553(a)(2)(B)-(C). Second, the judge wished to encourage Fowler's rehabilitation by avoiding a life-equivalent sentence, *see* 18 U.S.C. § 3553(a)(2)(D); he considered the potential impact of good-time credits when tailoring a sentence that would comply with this goal.

11

A.

Take recidivism first. As Fowler's own cited precedent and literature shows, "the risk of recidivism is inversely related to an inmate's age" at release. *United States v. Howard*, 773 F.3d 519, 533 (4th Cir. 2014). Multiple studies have suggested that, in general, prisoners are less likely to be rearrested when they are released at an older age. *Id.* (citing several studies). Among sex offenders, the oldest prisoners on release were least likely to be rearrested for a sex crime. Appellant's Opening Br. at 51 (citing a Bureau of Justice Statistics study). Although several of these studies limited their oldest age category to age 45 or older, "[n]o doubt statistics for offenders released after age 60 are even more compelling." *Howard*, 773 F.3d at 533 (citing literature on geriatric release).

Recidivism is key to two purposes of sentencing: protection of the public and deterrence. 18 U.S.C. § 3553(a)(2)(B)-(C). By Fowler's own admission, his "demographic profile" and its tie to recidivism is also relevant to his history and characteristics under 18 U.S.C. § 3553(a)(1). Appellant's Opening Br. at 60. If a prisoner is released at an age where recidivism is more likely, bad conduct may not be deterred and the public may not be protected. These concerns were at the forefront of the district judge's mind. As he explained while sentencing Fowler, "[i]t would be grossly inappropriate for these kinds of offenses to have a man at the age of 40 be released into the public in light of what's been reflected here, despite all the precautions that will be taken . . . ." J.A. 75. But at the same time, he did not think "that it would serve any purpose in terms of protecting the public . . . for [Fowler] to serve until he's 70 years of age. . . . I think there are certain

12

realities and maturities and physical maturities and whatever that reflect that that's not necessary." J.A. 74.

In the end, the district judge concluded that a 40-year sentence which equated with Fowler's release at the age of 67, while allowing him the possibility of release "in the vicinity of his 60th birthday" with good-time credits, was appropriate. J.A. 75. The judge's consideration of Fowler's minimum age at release in reaching this sentence was sensible. *See United States v. Al-Din*, 631 F. App'x 313, 338 (6th Cir. 2015) (upholding sentence after the district court considered whether it "would be sufficient to serve the [§ 3553(a)(2)] purposes of punishment and deterrence even if [the defendant] earned early release" through good-time credits). Disallowing any mention of potential good-time credits would simply make them a matter of silent consideration with all of its attendant loss in transparency. It would also hamstring judges who are attempting to follow Congress's mandate to set sentences which protect the public and deter additional crimes. *See* 18 U.S.C. § 3553(a)(2)(B)-(C).

B.

The district judge considered Fowler's minimum age at release for a second reason: to avoid imposing a life-equivalent sentence that would discourage rehabilitation. Overall, the judge cut Fowler a significant break. He did not sentence Fowler consistent with the Guidelines recommendation of life. He did not sentence Fowler to 50-years' imprisonment, as the government requested. The judge concluded that "to say you're in prison for life is not going to accomplish anything, because a person has no hope, no light at the end of the tunnel." J.A. 74. For this reason, the judge wanted to design a non-life-equivalent sentence

13

that would allow the possibility of Fowler's release around the age of 60. As the sentencing transcript makes clear, the judge meant to give Fowler only the possibility, not the certainty, of release around the age of 60. More than once, the judge mentioned that early release was not a given.

Rehabilitation, however, was on the district judge's mind. *See* 18 U.S.C. § 3553(a)(2)(D). The Supreme Court has made clear that a trial court "commits no error by discussing the opportunities for rehabilitation within prison or the benefits of specific treatment or training programs." *Tapia v. United States*, 564 U.S. 319, 334 (2011). The record reflects that the court did not lengthen Fowler's sentence in order for him to complete any particular rehabilitative regimen. It was hardly impermissible for the court to be concerned that Fowler would have no reason to improve himself if he remained in prison for life. By avoiding a life-equivalent sentence, the judge chose not to extinguish every flicker of hope. To find a sentence that would punish, deter, and protect, while simultaneously encouraging rehabilitation, the judge settled on a 40-year term.

To confirm that a 40-year sentence was not life equivalent, the district judge considered the potential impact of good-time credits on Fowler's age at release. As this court has held, a judge may do just that. *United States v. Gullett*, 75 F.3d 941, 951 (4th Cir. 1996). In *Gullett*, the district court needed to avoid a life-equivalent sentence under the statute at issue. *Id.* at 950-51. Here, the district judge wanted to avoid a life-equivalent sentence to encourage rehabilitation. *See* 18 U.S.C. § 3553(a)(2)(D). We do not think this is an impermissible sentencing objective. Such a sentence may, along with good-time

credits, encourage an inmate's better behavior in prison while offering the prospect of ultimately leading a better life by doing something constructive nearer the end of it.

The district judge concluded that under a 40-year sentence, Fowler would "perhaps" be released "in the vicinity of his 60th birthday" if he earned good-time credits. J.A. 75. This sentence struck the judge's desired balance: it in no way made light of Fowler's heinous conduct, but it was not life equivalent. Sentencing is supposed to embody just this sort of balance. And appellate courts are advised not to disturb it. As the Supreme Court has noted, "[t]he sentencing judge is in a superior position to find facts and judge their import under § 3553(a) in the individual case." *Gall*, 552 U.S. at 51 (internal quotation marks omitted).[*]

## C.

Finally, the district judge did not undermine Congress's intent with respect to good-time credits. Good-time credits are administered by the BOP to "reward[] and reinforce[]" good behavior by prisoners. *Barber v. Thomas*, 560 U.S. 474, 482-83 (2010). The district

---

[*] Nor did the district judge commit procedural error during his consideration of good-time credits, as Fowler contends. Fowler alleges the judge erred by mentioning a "20% knockoff perhaps" for good-time credits, J.A. 75, when good-time credits can reduce a sentence by 14.8% a year at most, *see* 18 U.S.C. § 3624(b)(1).

Under plain error review, we cannot say that any prong of *Olano* is satisfied. It is not clear the district judge erred, much less that Fowler's substantial rights or the judicial process's integrity were impacted. *See Olano*, 507 U.S. at. 732-36. The judge spoke of his goal of setting a sentence that would allow Fowler the possibility of release "in the vicinity of his 60th birthday." J.A. 75. He relied on an approximation of good-time credits to confirm that a 40-year sentence was consistent with this goal and found it was. Even if the judge's calculation is performed using 14.8% instead of 20%, it shows Fowler could be released at the age of 61, which is certainly "more in the vicinity of his 60th birthday, not his 70th birthday," J.A. 75.

15

judge never intruded on this authority. He did not assume that Fowler would earn good-time credits or attempt to dictate to the BOP how many credits to award. Rather, he said that "perhaps" Fowler would earn good-time credits, and that the decision was "up to the Bureau of Prisons. I can't control that . . . ." J.A. 75. We find that formulation unexceptionable.

IV.

Fowler next argues that his sentence of 40-years' imprisonment was substantively unreasonable because it was longer than necessary to serve the purposes of sentencing. Specifically, he alleges that the district judge reached an unreasonably long sentence after overweighing one factor, protection of the public, while underweighing others, including his mental health issues, difficult childhood, and the need to avoid unwarranted sentencing disparities.

This argument is easily answered. In light of the foregoing discussion, it should be clear that the district court conducted a procedurally thorough hearing, the result of which was to arrive at a substantively reasonable sentence. While the consideration of one § 3553(a) factor to the exclusion of the others is not appropriate, *see United States v. Green*, 436 F.3d 449, 457 (4th Cir. 2006), it is not required that the district court somehow give all the different factors precisely equal weight. Sometimes one factor will outweigh the others. Sometimes one factor will stand out. *United States v. Pauley*, 511 F.3d 468, 476 (4th Cir. 2007).

16

Here, after both considering and addressing Fowler's arguments, the district court made clear it could not overlook the gravity of Fowler's conduct and its life-shattering consequences. As the trial judge noted:

> [Y]ou've also laid great pain upon the victims of this offense, and, quite frankly, you've laid pain upon the victim, particularly Jane Doe 1, that I suspect is incurable, meaning that you have already sentenced her to a life imprisonment.
> There is just simply no way that Jane Doe 1 is going to have a normal life, ever, as a result of this abuse, and is at an age now where she clearly, at 12 years of age, is right on the edge of developing physically and trying to develop emotionally, and you have laid that scar on her for the rest of her life.

J.A. 71. To put it mildly, there was nothing remotely unreasonable about Fowler's sentence.

## V.

Sentencing, in one sense, involves an implicit dialogue between trial and appellate judges. The institutional advantage district judges enjoy while sentencing has been repeatedly recited. And when trial courts utilize that institutional advantage to listen, engage, and explain, appellate courts should be reluctant to hack and saw at their rulings. The trial court here did something even more. It reminded us that strict sentencing need not on that account be inhumane, and we readily affirm its judgment.

AFFIRMED