**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 19-4888**

_____

UNITED STATES OF AMERICA,

       Plaintiff – Appellee,

v.

MIKKEL MCKINNIE,

       Defendant - Appellant.

_____

Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh. James C. Dever, III, District Judge. (5:18-cr-00286-D-1)

_____

Argued: October 29, 2021                    Decided: December 27, 2021

_____

Before WILKINSON, AGEE, and FLOYD, Circuit Judges.

_____

Affirmed by published opinion. Judge Wilkinson wrote the opinion in which Judge Agee and Judge Floyd joined.

_____

**ARGUED:** Seth Allen Neyhart, Durham, North Carolina, for Appellant. David A. Bragdon, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee. **ON BRIEF:** Robert J. Higdon, Jr., United States Attorney, G. Norman Acker, III, Acting United States Attorney, Jennifer P. May-Parker, Assistant United States Attorney, Kristine L. Fritz, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.

_____

WILKINSON, Circuit Judge:

On the morning of December 1, 2016, Trevor Nelson died of a drug overdose. Hours before his death, Nelson was sold "China White" fentanyl by appellant Mikkel McKinnie. McKinnie was indicted in the Eastern District of North Carolina and pleaded guilty to distribution of a detectable amount of fentanyl, in violation of 21 U.S.C. § 841(a)(1). The district court imposed a sentence of 120 months, justified both as an upward variance and upward departure from the Guidelines range. Because the district court acted within its discretion, we reject McKinnie's challenge to the procedural and substantive reasonableness of his sentence.

I.

A.

Lauren Duppstadt left her home in Fuquay-Varina, North Carolina, at around 7 a.m. on December 1, 2016. When she returned at 10 a.m., she found her roommate, Trevor Nelson, unconscious on the bathroom floor. Despite attempts by emergency responders to resuscitate him, Nelson was declared dead. Officers collected two used needles and a spoon containing white powder at the scene. Subsequent testing revealed that one of the needles contained heroin, the spoon contained fentanyl, and the other needle contained both heroin and fentanyl. An autopsy determined that Nelson died from "[a]cute intoxication of alprazolam, heroin, and fentanyl." J.A. 74.

Officers secured a search warrant for Nelson's phone, which revealed numerous texts between Nelson and his drug dealer, Mikkel McKinnie. Using surveillance footage,

witness interviews, text messages, call logs, and cellphone location data, investigators pieced together the events that led to Nelson's death.

On November 27, 2016, McKinnie texted Nelson, explaining that his supplier was coming down from New Jersey with "China White," a potent narcotic containing fentanyl. The next day, November 28, McKinnie bragged about the drug's strength by claiming it was causing people to overdose. J.A. 214 ("[G]ot it last night but my ppl just call me back told me too b careful cuz ppl going out on that shit."). McKinnie agreed to sell Nelson a gram, and at just after 2 p.m., Nelson and McKinnie arrived at a Sheetz gas station to complete the transaction. After purchasing the China White, Nelson immediately used it in the Sheetz bathroom. Upon exiting, Nelson was so visibly impaired that an employee called 911. Nelson and McKinnie left as police arrived.

Later that evening, McKinnie texted his supplier, praising the drug's effect on Nelson, who "couldn't even walk, talk, think that m.f. was gone bro." J.A. 215. The following day, McKinnie warned another customer about the strength of the drug: "Please b careful its really strong." *Id.*

On November 30, the day before his death, Nelson texted McKinnie seeking one or two grams to ward off his opioid withdrawal symptoms. Nelson also stated that he would purchase from another dealer in Durham, North Carolina, if McKinnie was unavailable. After a brief call with McKinnie, Nelson texted him, "Aight I catch u another time I got to go." J.A. 216. Location data from Nelson's cellphone demonstrates that he then traveled to and from Durham. As Nelson returned from Durham, McKinnie mocked him for going to another dealer: "Y u go by that bullshit I got u. u know I got that fire." *Id.*

That evening, Nelson asked how much McKinnie would charge for half a gram of China White and McKinnie encouraged him to purchase a whole gram. Nelson agreed to make a purchase, and cellphone location data confirms that McKinnie made the delivery at Nelson's house.

When Nelson's roommate left for work the following morning, Nelson was alive and well. Three hours later, he was found unconscious on the floor of his bathroom. The afternoon of Nelson's death, McKinnie's supplier texted him, "shit krazy boy," to which McKinnie responded: "My bad bro I got the money tho just sold last lil bit of the shit, took longer than expected." J.A. 217.

B.

McKinnie was arrested and charged with (1) distribution of a detectable amount of fentanyl; and (2) distribution of a detectable amount of fentanyl resulting in serious bodily injury and death. *See* 21 U.S.C. § 841(a)(1), (b)(1)(C). In exchange for the dismissal of the second charge, McKinnie pleaded guilty to the first charge. Prior to sentencing, the government submitted a brief arguing for a sentence above the Guidelines range.

At the sentencing hearing, the government presented three witnesses, each of whom the district court found to be credible. Detective Greg Hamilton and retired detective Ryan Blackwell described the investigation leading to McKinnie's arrest and the evidence against him. The government also called Dr. Ruth Ellen Winecker, who spent 19 years as the Chief Toxicologist for the North Carolina Medical Examiner system. Dr. Winecker explained that fentanyl is "a hundred times more potent than morphine," and that if users

4

take their "usual" dose of what they believe to be heroin, then "they're at very high risk of overdosing." J.A. 105–06.

Citing Nelson's toxicology report, Dr. Winecker focused on three drugs found in his system: alprazolam (Xanax), morphine, and fentanyl. The first drug, Xanax, was found in a concentration of .087 milligrams/liter, which is within the normal therapeutic range. The second drug, morphine, was found at a concentration of .099 milligrams/liter. According to Dr. Winecker, the presence of a chemical known as 6-monoacetylmorphine indicated that this morphine must have come from heroin, which is ultimately broken down by the body into morphine. The .099 milligrams/liter of morphine was "not unusual in any way" for a heroin user and was right around the .10 milligrams/liter medical examiners typically see among such individuals. J.A. 110.

Dr. Winecker drew particular attention to the 100 nanograms per milliliter concentration of fentanyl, which was "notable for how elevated it is." J.A. 111. Over the five years preceding June 2018, the median concentration in deceased individuals where fentanyl was detected was 11 nanograms per milliliter, meaning the concentration in Nelson's blood was nearly 10 times higher. Moreover, of the 2,142 such cases, only nine (0.4%) involved concentrations higher than 95 nanograms per milliliter.

After the testimony of the three witnesses, a statement from Lynn Nelson, Trevor Nelson's mother, was read. She described her loss "so deep, so permanent and so heartbreaking, words are simply not enough," and shared her horror that McKinnie would trade "a few dollars in exchange for human life." J.A. 130–34.

5

McKinnie declined to make a statement and conceded that he had no objections to the presentence report (PSR) that would affect the calculation of the Sentencing Guidelines range. The court adopted the uncontested portions of the PSR, which recommended an offense level of 12—based on the quantity of drugs distributed by McKinnie—and a criminal history category of IV, leading to an advisory Guidelines range of 21 to 27 months. The calculation was based solely on the drug quantity attributed to McKinnie and did not take into account Nelson's death.

After a lengthy discussion of the 18 U.S.C. § 3553(a) factors and McKinnie's conduct, the district court imposed a sentence of 120 months. This sentence was justified on three grounds: (1) an upward variance under the § 3553(a) factors, (2) an upward departure under U.S.S.G. § 5K2.1 (Death), or (3) an upward departure under U.S.S.G. § 5K2.21 (Dismissed and Uncharged Conduct). The court initially focused on the seriousness of McKinnie's conduct which "absolutely manifested a complete disregard of human life." J.A. 135. The court addressed McKinnie's arguments and rejected his claim that the evidence was insufficient to show that he sold Nelson fentanyl the night before his death. On the basis of the "shocking" testimony about the level of fentanyl in Nelson's body and the court's finding that McKinnie "sold this fentanyl to the decedent," the court found that the upward departures for Death, U.S.S.G. § 5K2.1, and Dismissed Conduct, U.S.S.G. § 5K2.21, were appropriate. J.A. 138–41. The court also justified the 120-month sentence as a variance under the § 3553(a) factors, focusing on McKinnie's role in Nelson's death, his "callous" disregard of the risk involved with distribution of fentanyl, his

6

extensive criminal history along with his failure to respond to leniency shown for previous convictions, and the "dire need" for general deterrence. J.A. 135–44.

McKinnie now appeals his sentence, arguing it was procedurally and substantively unreasonable.

II.

The primacy of the district court's role in sentencing is well-settled. We review sentences, including those outside the Guidelines range, for abuse of discretion. *Gall v. United States*, 552 U.S. 38, 41 (2007). Under this standard, the district court's factual findings are reviewed for clear error, while legal conclusions are reviewed *de novo*. *United States v. Provance*, 944 F.3d 213, 217 (4th Cir. 2019). This deference is justified by the Supreme Court's consistent recognition that the "sentencing judge is in a superior position to find facts and judge their import under § 3553(a) in the individual case. The judge sees and hears the evidence, makes credibility determinations, has full knowledge of the facts and gains insights not conveyed by the record." *Gall*, 552 U.S. at 51; *see also Rita v. United States*, 551 U.S. 338, 357–58 (2007) ("The sentencing judge has access to, and greater familiarity with, the individual case and the individual defendant before him than the Commission or the appeals court."). Reliance on district courts is essential in ensuring that "the punishment will suit not merely the offense but the individual defendant." *Wasman v. United States*, 468 U.S. 559, 564 (1984).

We review sentences in two steps. First, we determine whether the district court has committed significant procedural error. *United States v. Fowler*, 948 F.3d 663, 668 (4th

Cir. 2020) (citing *Gall*, 552 U.S. at 51). Second, we consider whether the sentence imposed was substantively reasonable. *Id.*

A.

A sentence is procedurally unreasonable if the district court committed a serious procedural error, such as improperly calculating the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence. *Fowler*, 948 F.3d at 668. McKinnie concedes that the district court properly calculated the Guidelines range. And he does not contest the fact that the district court considered the § 3553(a) factors and extensively explained the chosen sentence. Indeed, the district court conducted a lengthy sentencing hearing, providing McKinnie every chance to raise his arguments. The district court stated that it "considered all arguments that have been made on behalf of Mr. McKinnie," and addressed them throughout the sentencing explanation. The court, for instance, rejected "root and branch" McKinnie's claim that the evidence was insufficient to demonstrate that he sold fentanyl to Nelson hours before his death. J.A. 137.

Instead, McKinnie argues that the district court procedurally erred by considering his role in causing Nelson's death when imposing the 120-month sentence. For the reasons that follow, we disagree and find the upward variance procedurally reasonable.[*]

---

[*] Because McKinnie's variant sentence is procedurally reasonable, we do not consider his arguments related to the district court's alternative departure rationales. *See United States v. Gomez-Jimenez*, 750 F.3d 370, 383 (4th Cir. 2014).

8

District courts may impose sentences above the Guidelines range through either a "departure" or a "variance." A departure is a deviation from the Guidelines range "computed by examining the provisions of the Guidelines themselves," while a variance is a deviation from the Guidelines range "based on application of the other statutory factors in 18 U.S.C. § 3553(a)." *United States v. Cruz-Perez*, 567 F.3d 1142, 1146 (9th Cir. 2009). District courts may impose an upward variance from a defendant's Guidelines range if it is justified by the § 3553(a) factors, as considered under the totality of the circumstances. *Gall*, 552 U.S. at 51. Here the district court found that two upward departures applied, U.S.S.G. § 5K2.1 (Death) and U.S.S.G. § 5K2.21 (Dismissed and Uncharged Conduct). But it also justified McKinnie's 120-month sentence as an upward variance under the § 3553(a) factors. The district court cited McKinnie's awareness of the risk involved with distribution of fentanyl, his pattern of recidivism, and the need for general deterrence to support the variance. The district court's extensive sentencing explanation—which spanned nearly 10 transcript pages and tied the sentence to the § 3553(a) factors— demonstrates that the court did not abuse its discretion in imposing the variance. *See* J.A. 135–44.

### 1.

McKinnie nonetheless argues that the district court erred in imposing an upward variance by taking into account Nelson's death without finding that McKinnie's fentanyl was the but-for cause of that death. McKinnie grounds his argument on the fact that a but-for finding is required for conviction under 21 U.S.C. § 841(b)(1)(C) (death or serious injury resulting from distribution), *see Burrage v. United States*, 571 U.S. 204 (2014),

9

or for application of the § 2D1.1 Sentencing Guidelines enhancement for "death or serious bodily injury result[ing] from" distribution, *see Young v. Antonelli*, 982 F.3d 914 (4th Cir. 2020). Both are inapposite, however, to an upward variance under the § 3553(a) factors.

The distinction between variances and departures matters. Even if the but-for causation standard applies to a sentencing departure under the Guidelines, it is not similarly required for an upward variance under § 3553(a). District courts need not commit themselves to a specific, enumerated departure when weighing the § 3553(a) factors. *United States v. Evans*, 526 F.3d 155, 164–65 (4th Cir. 2008). When considering a variance, district courts may thus consider evidence that a defendant's actions contributed to death or serious injury. This is so even if the evidence is insufficient to meet the but-for causation standard required for the "death results" enhancement under the Sentencing Guidelines, *Young*, 982 F.3d at 918–19, or for conviction of distribution resulting in death, *Burrage*, 571 U.S. at 210–19.

This conclusion is dictated by the statutory text, which is importantly different from that at issue in both *Burrage* and *Young*. In *Burrage*, the Supreme Court interpreted 21 U.S.C. § 841(b)(1)(A)–(C), providing for increased punishment "if death or serious bodily injury results from the use of such substance." *Id.* The Court held that but-for causation was mandated by the statutory phrase "results from." *Id.* And in *Young*, our court similarly held that the U.S.S.G. § 2D1.1 enhancement, available where "death or serious bodily injury resulted from the use of the substance," requires but-for causation based on that provision's "parallel language." 982 F.3d at 918–19.

10

In contrast with these provisions, the text of 18 U.S.C. § 3553(a) contains no similar "results from" language. Instead, it mandates that district courts examine, inter alia, "the nature and circumstances of the offense," *id.* § 3553(a)(1), and "the seriousness of the offense," *id.* § 3553(a)(2)(A), under the totality of the circumstances. *Gall*, 552 U.S. at 51. Congress has further established that, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661. Evidence of causation, even if it does not meet the but-for standard, is clearly relevant to the circumstances and seriousness of an offense and may thus properly be considered under the § 3553(a) variance analysis.

The precedent of our sister circuits, in cases with significant factual similarities, supports this conclusion. In *United States v. Heindenstrom*, the First Circuit held that even where the fentanyl distributed was found *not* to be the but-for cause of death, the fentanyl's contribution to that death could justify an upward variance under the § 3553(a) factors because "[c]ourts have always taken into consideration the harm done by the defendant in imposing sentence." 946 F.3d 57, 60–61, 63–64 (1st Cir. 2019) (quoting *Payne v. Tennessee*, 501 U.S. 808, 825 (1991)). The court proceeded to affirm a variance more than four times the Guidelines range based on the seriousness of the offense, the defendant's awareness of the risk, and the need to achieve general deterrence. *Id.* at 59–61, 65–66. The Fifth Circuit reached the same conclusion in *United States v. Hudgens*, 4 F.4th 352, 358–61 (5th Cir. 2021), likewise holding that causation that does not meet the but-for standard can be considered in the variance analysis. Citing § 3553(a)(1) and § 3553(a)(2), the court

11

noted that "the [district] court's consideration of [the decedent's] death in fixing Hudgens's sentence was not a clear error in judgment." *Id.* at 358–59. The court affirmed a 119-month upward variance in a heroin and methamphetamine case based on the defendant's role in the death, knowledge of the risks, criminal history, and failure to provide help to the decedent. *Id.* at 356, 360–61.

2.

While the absence of but-for causation thus need not be fatal to the trial court's variant sentence, the hearing transcript indicates that such a finding was made. A factual finding of this kind is reviewed for clear error, *Provance*, 944 F.3d at 217, and the evidence demonstrates this finding was not clearly erroneous.

The district court did not use the magic words "but-for causation." But its analysis makes clear that it concluded that the fentanyl McKinnie sold to Nelson was the but-for cause of his death. The district court first rejected McKinnie's argument that the evidence was insufficient to establish that he met with Nelson the night before his death and sold him fentanyl. J.A. 137 ("I reject that argument root and branch."). Next, the court referenced the "level of fentanyl in the decedent, fentanyl that he got from the defendant." J.A. 138. Finally, on the basis of the court's conclusion that McKinnie sold "this" fentanyl to Nelson on the night before his death, the "shocking" level of fentanyl in Nelson's body, and the testimony that Nelson was alive the next morning when his roommate left, the court found that departures under U.S.S.G. § 5K2.1 (Death) and U.S.S.G. § 5K2.21 (Uncharged Conduct) were warranted. J.A. 138–41. The district court's application of the § 5K2.21

departure confirms that it found the but-for causation standard met, as such a finding was required for the departure to apply.

Three main strands of evidence indicate the district court's finding of but-for causation was not clear error. First, the extreme amount of fentanyl present in Nelson's body, as compared with the typical amount of heroin and a therapeutic amount of Xanax, indicates that the fentanyl was the lethal agent. Second, there is evidence to support the finding that it was precisely the fentanyl McKinnie sold that was fatal, not the drugs Nelson purchased from a different dealer in Durham. Nelson was undergoing opioid withdrawal the day before his death, and thus almost certainly consumed the drugs he purchased in Durham immediately to satisfy his cravings. *See* J.A. 216 ("Let me know soon bc I'm sick so I got to run to Durham if u busy n can't do it"). Nelson's swift attempts to arrange a sizeable purchase from McKinnie after visiting Durham also indicate that he did not keep any of the Durham-purchased drugs for later use. Third, Nelson's roommate made clear that he was alive and well the morning following his visit to Durham, indicating those drugs could not have caused his death. Instead, the only plausible explanation for Nelson's passing was his consumption on the morning of his death of the potent fentanyl sold to him by McKinnie the night before. Under clear error review, no more evidence is required.

B.

McKinnie next argues that his sentence was substantively unreasonable because the substantial upward variance was not justified by the § 3553(a) factors. Consideration of the record and the district court's lengthy sentencing explanation, however, make clear that the variance was well supported. We thus reject McKinnie's argument to the contrary.

13

In reviewing the substantive reasonableness of a sentence, we "examine[] the totality of the circumstances to see whether the sentencing court abused its discretion in concluding that the sentence it chose satisfied the standards set forth in § 3553(a)." *United States v. Mendoza-Mendoza*, 597 F.3d 212, 216 (4th Cir. 2010). While we must consider the extent of the variance from the sentencing range, the fact that we "might reasonably have concluded that a different sentence was appropriate is insufficient to justify reversal of the district court." *Gall*, 552 U.S. at 51. And variant sentences are generally reasonable when "the reasons justifying the variance are tied to § 3553(a) and are plausible." *Provance*, 944 F.3d at 219 (citation omitted).

As noted by the Supreme Court in *Rita*, 551 U.S. at 347–48, § 3553(a) requires that the district court consider:

> (1) offense and offender characteristics; (2) the need for a sentence to reflect the basic aims of sentencing, namely, (a) "just punishment" (retribution), (b) deterrence, (c) incapacitation, (d) rehabilitation; (3) the sentences legally available; (4) the Sentencing Guidelines; (5) Sentencing Commission policy statements; (6) the need to avoid unwarranted disparities; and (7) the need for restitution.

The district court's explanation for the variant sentence makes clear that it is justified by these factors. The court grounded its variance on three primary components: (1) the seriousness of McKinnie's conduct; (2) McKinnie's extensive criminal history and the leniency shown him by the state system; and (3) the need to deter other drug dealers aware of the lethal risks posed by the fentanyl they are distributing.

The district court's explanation demonstrates a focus on the "nature and circumstances of the offense," 18 U.S.C. § 3553(a)(1), and the "seriousness of the offense,"

*id.* § 3553(a)(2)(A). Throughout the sentencing hearing, the court hammered home the "extraordinarily serious criminal conduct," J.A. 136, and "serious nature of this offense," J.A. 138. In particular, the court found "chilling" the timeline of events leading to Nelson's death and McKinnie's manifest awareness of the risks of distributing China White. J.A. 136. The court described as "absolutely stunning," J.A. 137, two texts in which McKinnie bragged that "ppl [are] going out on that shit," J.A. 214, and praised his supplier for the strength of the China White by describing the effect it had on Nelson, who "couldn't even walk, talk, [or] think" after taking the drug. J.A. 215. McKinnie's decision to "callously" wring profit from his customers "knowing the risk" posed by this "extraordinarily dangerous narcotic" "absolutely manifested a complete disregard of human life." J.A. 136–41.

The court also focused on the "the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1), and the need for individual deterrence, incapacitation, and rehabilitation, *id.* § 3553(a)(2). The court described McKinnie's "serious criminal history," J.A. 142, including a conviction for possession with intent to manufacture, sell, and deliver cocaine, one for driving while impaired, and multiple convictions for assault on a female. Despite these prior convictions, McKinnie was granted "[l]eniency down the line," J.A. 138, and the longest custodial sentence he ever served was 90 days. Rather than gratefully accepting this leniency and rehabilitating himself, McKinnie instead took advantage of it, responding with "more drug dealing and criminality." *Id.* McKinnie's escalating criminal conduct and the failure of prior sentences to deter him from future criminality dictated that "he needs to be incapacitated, society needs to be protected from him." J.A. 141. In an

15

attempt to provide for the rehabilitation the prior leniency failed to encourage, the court also required participation "in a program approved by probation for narcotic addiction," J.A. 143, and recommended "vocational, educational opportunities," and "intensive substance abuse treatment" while incarcerated, J.A. 144.

Finally, because "McKinnie is not alone in his callousness," the court described the "the dire need to . . . generally deter others." J.A. 142. The decision of drug dealers like McKinnie to continue to sell a dangerous drug while simply warning customers "hey, people are falling out," made clear that "[g]eneral deterrence is critical as well here." *Id.*

The district court did not abuse its discretion by varying upward based on these factors. McKinnie's conduct is, in fact, more extreme than that in *Heindenstrom*, where the First Circuit upheld a variance more than four times the Guidelines maximum. 946 F.3d 57 (1st Cir. 2019). There, the defendant possessed only general awareness of the dangers of fentanyl, while McKinnie knew that China White was causing overdoses, warned customers of the danger, and witnessed firsthand the effect it had on Nelson at the Sheetz gas station. *Id.* at 60, 65-66. The defendant there also lacked the substantial criminal history and recidivist tendencies that support the variance here.

McKinnie's sentence was also well in line with upward variances approved by this court and by the other courts of appeals. *See e.g.*, *United States v. Nance*, 957 F.3d 204 (4th Cir. 2020) (affirming 36-month variance in cocaine, cocaine base, heroin, and firearm case based on criminal history); *United States v. Evans*, 526 F.3d 155 (4th Cir. 2008) (affirming 95-month variance in identity fraud case based on criminal history); *United States v. Hudgens*, 4 F.4th 352 (5th Cir. 2021) (affirming 119-month variance in heroin

and methamphetamine case based on role of drugs in causing death, knowledge of the risks, criminal history, and defendant's failure to aid dying victim); *United States v. Robinson*, 892 F.3d 209 (6th Cir. 2018) (affirming 40-month variance in fentanyl case based on criminal history, harm caused by opioid epidemic, and defendant's awareness of risk created by storing fentanyl in reach of a young child); *United States v. Ruvalcava-Perez*, 561 F.3d 883 (8th Cir. 2009) (affirming 48-month variance in cocaine and illegal reentry case based on criminal history); *see also United States v. Myers*, 589 F.3d 117 (4th Cir. 2009) (affirming 239-month departure in crack cocaine case based on criminal history). In sum, the district court's sentencing explanation made clear that McKinnie demonstrated utter indifference to Nelson's life. The fact that Nelson was an addict did not make his life expendable or any less deserving of the respect that was never shown him here. To enhance his own profits, McKinnie pressed Nelson continuously to make sales, even mocking him for seeking out a dealer with less potent wares. The district court did not abuse its discretion by imposing a substantial punishment for this conduct.

## III.

The opioid epidemic has wrought a terrible toll on our nation and so many communities within it. *See* Roni Caryn Rabin, *Overdose Deaths Reached Record High as the Pandemic Spread*, N.Y. Times (Nov. 17, 2021) (describing more than 100,000 overdose deaths between April 2020 and 2021, primarily driven by fentanyl). When drug dealers knowingly ply their customers with what could well be lethal doses, district courts do not abuse their discretion by taking behavior simultaneously destructive of society and

17

individual life into account. McKinnie's sentence is supported by the § 3553(a) factors and

the judgment of the district court is accordingly

*AFFIRMED.*